Good morning, Your Honors. May it please the Court, I am Bruce Wagman, and I represent the plaintiffs in this action. This case goes to the heart of plaintiffs' interest in their health and well-being, in the safety of the food they eat, and to the welfare and future of their families. It also focuses on EPA's failure to undertake a mandated program that would provide my clients with the assurance that the foods they eat and the air they breathe are safe by today's standards. I'm not going to go over the rather complicated statutory framework. I'm sure you appreciate what we're here about. The only question for this Court is standing under Article III, so we must focus on that inquiry at this stage. The EPA's inaction here has injured plaintiffs' economic interests, has put them in reasonable fear of physical injury, has deprived them of the knowledge Congress wants them to have, and has affected their rights that are an outgrowth of the program for testing of pesticides and the information the plaintiffs are entitled to receive. By failing to implement the programs, the EPA is costing plaintiffs money, it's jeopardizing their health, it's putting them in fear of unknown and potentially catastrophic disease for themselves and their families, and it's injuring them in essentially every way the satisfying standing under Article III. The District Court focused on a misplaced inquiry, and its order is in conflict with controlling case law here and at the Supreme Court. I'll move through each type of injury. The first is one that should virtually end the plaintiffs' inquiry here, and one that the District Court didn't address at all, and that's the economic injury. The EPA's failure to implement the program has forced plaintiffs to purchase more expensive foods, because they are unable to tell which pesticides might make them sick and which ones are safe. Well, but maybe none of them. Absolutely, Your Honor. You're absolutely correct. And even if none of them, plaintiffs have the right to have EPA implement that program. If, for some reason, all 9,000 chemicals that Congress has decided should be tested came up safe, then my plaintiff's injury would be addressed, because the injury is that EPA has not implemented. The District Court focused on the fact that we had not identified a pesticide that made us sick. That's not the inquiry here. Well, shouldn't the plaintiffs at least have been able to point to some evidence somewhere that suggested that one of these 9,000 chemicals actually had this adverse effect? Well, Your Honor, let's focus on the standing inquiry, first of all. We need a reasonable fear to satisfy the standing injury here. And I submit that it's a reasonable fear based on a few things. The first is that Congress enacted a statute and a set of statutes that involves 9,000 chemicals, that involves multimillion dollars, multi-years, involves a 39-person committee of industry, government and science. Congress enacted the statute with the clear concern that pesticides were a concern in our environment. There just can't be any question about that. We have an understanding that there's a problem with pesticides. We need only look back the last three or four decades in this country, and we all understand that we almost lost the brown pelican, we almost lost the bald eagle, and we understand that workers get sick when exposed to pesticides. But pesticides aren't just things that are put on crops that are part of the food supply. I mean, some of the pesticide problems that are well known historically weren't necessarily related to crop pesticides. They may have been related to pesticides used for other purposes. I mean, the fact that there's possible adverse health effects from pesticides is something that everyone shares. It's not that particularized, concrete. Foods I eat have a pesticide. There's evidence that foods I eat or foods that I have to pay more so that I can avoid eating the other ones might have a pesticide in it that some evidence has shown will have this adverse effect on the endocrine system. Well, I see your concern, Your Honor. It sounds like partially a concern about a generalized grievance here, and it certainly is not. I'd cite the Supreme Court case of FEC v. Aikens in which the Court clearly said there are many injuries that are shared by many, but where there is a concrete injury identified, certainly that is one that the plaintiffs can state. Right, but I don't see what the concrete injury, concrete and particularized injury is to your clients. If you look at the declarations on pages 165 to 168 and around 172 in the record, the particularized injury is that my clients are in fear because the EPA has failed to implement that they may be eating substances which could have teratogenic and carcinogenic effects. And certainly that kind of fear is very particularized to my clients. It's particularized to them because they eat these products. It's particularized to them to some degree because they're vegetarians and they eat more plant-based. To all the universe of pesticides that need to be tested, and I agree with you, Congress passed this law, and it should be implemented, and they should be doing the testing. I mean, isn't there any evidence out there that you could have put into the record as to any one of these products actually causing an injury? Again, Your Honor, I don't, I think that's a really off point of what the inquiry should be here. This Court itself has said in Central Delta Water Agency and Citizens for Better Forestry that if plaintiffs can only prove their case by doing the work that the agency is supposed to, then they can never do it. That's what hasn't been done here. I'm not saying that they should be doing the testing, but surely there's some scientific data out there on some of these products that are supposed to be being tested. And again, I want to bring the Court back to the standing analysis. The standing analysis is not whether there's evidence of an injuring chemical. The standing analysis for purposes of the injuries my clients state is whether, first of all, they have an economic injury, which I submit is clearly stated based on what EPA is doing. And secondly, whether they have a ---- Actually, what the economic injury is that you have some declarations that say they're forced to buy organic food because of their fear and that organic food costs more, but there's no evidence of that. There's no evidence that organic food costs more. I mean, you could grow your own vegetables organically and it probably costs less than going to some of these, you know, Whole Foods grocery stores. Certainly, Your Honor, but I submit that we're here on a motion for summary judgment and the undisputed evidence in the record before this Court and the District Court was my client's declarations. That is evidence. It's sworn testimony and it's undisputed. So for purposes of this Court's review, organic food ---- You may just have to take face value everything your client says. But it is the evidence in this case. The evidence in this case on the record is that organic food costs more money. According to your client's opinion. And nobody disputed that. So if anybody could dispute it, but it hasn't been disputed, the EPA had the opportunity on summary judgment to dispute that. They haven't. As a practical matter, I usually don't buy the organic food because it's more expensive, but I believe that that evidence in the record certainly is clear. And again, let's move to the fear of injury cases. There are many of those. And the only question, again, is whether the fear of injury is reasonable. And I submit that when Congress scared us, if you will, into thinking that there are 9,000 chemicals out there that might cause harm, when we know about the fact that workers are injured, when we know about animals dying from pesticides, the fear is reasonable. That's the only question. It's not a question of putting forth at this point ---- Absolutely not, Your Honor. And I submit that in most of the cases that the Supreme Court has put forth in the analysis, neither has there been any such evidence. In the Duke Power case, plaintiffs were concerned. They had a concern about radiation. There wasn't no sign in the case on the record that they had put in evidence of the danger. The court said, quote, given our generalized concern about exposure to radiation and the apprehension flowing from the uncertainty about the health and genetic consequences, unquote, plaintiffs were granted standing. Here we have, again, I believe all of us as Americans understand that there's a potential problem with pesticides. We don't have to identify one. Plaintiffs simply have to have a reasonable fear about it. The Friends of Earth ---- You're saying all Americans have standing to bring this suit? No. Americans who have a concrete and particularized injury who say that they are concerned about what they eat and they are in fear. If someone is not ---- So any American who says that this Act was passed and now I have a fear would have standing under your analysis? If somebody sincerely is willing to state that under penalty of perjury, that they have a concern that the EPA is not providing them with the information they need to buy safe products, yes, that's a very important concern for all Americans, I think, but of course it's only a concern for those who are willing to state that. Many people may think Congress enacted this law, I feel okay with buying whatever I buy. So it's extremely concrete to these individuals. They have stated their experience with pesticides and their beliefs, which are sincere and reasonable. And again, the only inquiry is reasonable. In the Friends of Earth v. Laidlaw case, they only had a suspicion about pollution, yet they were granted standing. In the ecological rights case, they had a fear that runoff from defendant's facilities was damaging the creek and wildlife. In the Second Circuit case of Bower v. Veneman that we referenced in our briefs, it's another food case, okay? So there was a concern at that point in time about mad cow disease in At that point in time when the case was filed and during the argument, there had never been a case of mad cow disease in America. That was the defense. You have no evidence of mad cow disease. Yet the Second Circuit granted standing to Mr. Bower because he said he had a fear that the animals involved could give him mad cow disease. And lo and behold, several months later after the briefing, mad cow disease showed up. This case, the Central Delta Water case, cites the Gaston Copper case from the Fourth Circuit and quotes it directly and says, Plaintiff need not wait until his lake becomes barren and sterile. Such a novel demand would eliminate the claims of those who are directly threatened but not yet engulfed. Article 3 does not bar such concrete disputes from court. That's what we have here. We have a concern about something that's very real. Congress has enacted a statute that's something like 50 pages in the code book. They're concerned about pesticides. Again, if EPA had done their job and if they said 9,000 out of 9,000 just fine, then we wouldn't be here. That's what we don't have. But that may be the result. That's my point, Your Honor. EPA may someday say all 9,000 are just fine. That's my point. The injury to my plaintiffs is the fear that they have because the EPA has not implemented. It is not, absolutely not, the fact that they will get sick. It's the fear that they have, a fear instilled in them by 40 years of hearing about pesticides, by the Congress's enactment of this statute. But this is more than just pesticides are bad. This is pesticides may have this particular type of effect. A very serious effect, Your Honor, one that the – that Congress has directed the EPA to look for specifically. And clearly, if you read the statute, Congress is expecting that this is going to come up. Let me remind the Court that this is not a first shot at this. This is a reassessment of pesticides that in some cases have already been determined to be problematic and so the levels have been redetermined. This is a reassessment. Congress is telling EPA we want to reassess and retest these chemicals on an ongoing basis because we're concerned about situations that will cause the kind of tragedies that DES caused. But this is a particular effect. The prior assessments of safe levels of pesticides weren't looking for this particular effect. We don't know – they didn't set them by saying they have this effect at this level, we're going to lower the level. We have no idea if they'll have this effect, only a concern. Isn't that right? We don't know, but that's the whole point. EPA is supposed to tell us. That's the injury is that we don't know. Congress intended for us to know what we can do and we don't know that. The injury is that we don't have the answer, not that we might be injured as I'd like to save it for rebuttal. All right. I need to cancel. Good morning, Your Honors. May it please the Court. My name is Tamara Rountree. I represent the EPA. I would first like to point out, just to set straight, at the time that these plaintiffs brought their lawsuit and currently, on EPA's website there's information that there are possible endocrine effects. On the website, it identifies those pesticides that have been determined to disrupt the endocrine system. It also identifies the Is this in the record? I don't know that the website is currently in the appendix, the appendices. It was before the district court, though, and that is why the district court Did you put in evidence as to what information is on the website before the district court? That information was, the district court was aware of the fact that there was information available. Did you put in evidence in the record on what was on the EPA website as to these pesticides? Okay. Because if you didn't, you really can't raise a case. Okay. I understand. The point that I was going to is that the district court believed there was information available to these plaintiffs, whether it was about one single pesticide or a broad category of pesticides that may disrupt the endocrine system, and that these plaintiffs actually consumed and consumed with frequency and thereby presented a harm to them. What we're missing in this case, and if you don't mind, I'd like to take a second and actually go through the affidavits, we're missing key information. For example, for a moment, just to go to the economic, alleged economic injury. There is no statement in the affidavits that says we buy organic foods that cost us more than any other foods we would buy. Indeed, if we look particularly at the affidavit itself, it simply states that one of the appellants at page 167 of the excerpts of record, paragraph 9, she indicates that she attempts to purchase and feed herself and her child organic foods, and simply states that these foods are typically offered. The quote is, the actual word is they're offered at a higher price. She never says, though, that I buy these foods that are, quote, offered at a higher price. So we can't assume, for purposes of standing on summary judgment, we can't assume. Is that enough? I'm sorry? I mean, so you're just saying they should have reworded the declaration? No, no, no. Actually, it's not simply a question of wordsmithing. If she's simply saying that there are foods out there that are offered at a higher price, but she never says that she buys them, we can't assume that she does. So there's no ---- They could go back, refile, and file a declaration that says, I buy foods and pay more for them, and then you wouldn't contest standing? Well, if that's true, if that's true, perhaps she would jump the hurdle. But there still is the question of, for example, if she buys these higher-priced foods, what's the difference in cost between the organic foods and the foods she would otherwise buy? If it's de minimis, we don't have an economic injury here. If she doesn't buy them often, she buys them once a year, it may be de minimis again in terms of what her expenditure is. What we have in the affidavits alone, and let me remind the Court, there are only three The one they rely on almost most heavily is the complaint. And the complaint alleged only has mere allegations. That's not sufficient for standing. What's left is these two affidavits which are almost identical. And as I said, even though one may try to categorize what's missing from the affidavits as being a technicality, you run the risk of saying that standing itself is a requirement. Article III standing is a technicality. It's not. It requires particularity, as you pointed out, Judge Bolton. It requires particularity. It requires concrete evidence that goes to the allegations that are being made. Now I'd just like to make a couple of broad points before I go back to the actual affidavits. When this Court analyzes the harms, the claims of harm, causation, and redressability in this case, the Court must do it within the context of the specific statutory provision that the plaintiffs have claimed EPA has failed to comply with. Because where, as here, as is the case here, the claims are not based on the actual requirements in the statutory provision, then the plaintiffs can't establish standing for purposes of the litigation. It's simply a question of their saying, we want the agency to do X, but and it doesn't matter that the statutory provision that we're litigating here only requires the agency to do Y. And although I don't necessarily want to take the Court's time to walk through all of the requirements of implementing the screening program, and this is just a screening program that's required under the statute, the statutory provision that's being litigated, nothing in that provision, and it's at Section 346A, subsections P2 and actually P5, it's between P2 and P5 that Congress sets out what's required in implementing the screening program. Nothing requires EPA to execute the actions that the plaintiffs have based their claims of harm, causation and disability on. So it's very important that these aren't, it's not just a general category of EPA should be pulling pesticides off of the shelves or pulling them off of the marketplace or pulling certain crops from my grocery store. That's not required under the statutory provision that's at issue here. Q Well, has it developed a screening program? A I'm sorry? Q Has EPA developed a screening program? A The screening program has been developed and actually EPA put it in, began implementing the program according to the time frame of the statute. Q So did it obtain public comment and review? A Well, there have been public review comments throughout the process and different stages of it, but it did obtain, are you speaking and looking at P2? Q Yes. A Provision P2. To be honest with you, I, the agency did obtain public comment and review on the development of the screening program. Q So has it been carrying out the screening program? A The screening program has not been completed. It has, the EPA has been in the process of implementing since the time it, the time we began it. Q Okay. So the statute says that within three years after 1996, the administrator shall implement the program. A And it began implementing the program at that time frame. Q Shall implement means not begin to implement. It means implement it. Carry out the program. A Well, this goes, clearly goes to the merits as to how implemented the program. Q No, it clearly goes to the merits, but I'm just, you were talking about the relief sought and part of the whole disability issue is, could we grant relief, even if they have standing, could we possibly grant relief that would redress their claims? A To go, perhaps to answer more directly the question you're after, if the court were to require EPA to complete an extensive, it's so extensive that I can't even begin to indicate what was Q They haven't. A They haven't completed. They haven't completed the implementation. No, that has not been done. If I could just give the court Q Well, what does that mean? Does that mean they are screening some things, but they haven't started screening all 9,000? A The process of implementation is extremely vast and it's an extensive undertaking. If I could refer the court to pages 125 to 133 of the excerpts of record and to the entirety of the government's excerpts of record, it sets forth the details that are required to implement the program. So though you still might not be able to appreciate all that's required Q The program, implementing the program doesn't necessarily mean testing all the substance. The program could be a program for testing. A No, no, no. Implementing the program would be, would include the testing. It's not just developing the program and going through the peer review. Q It doesn't mean all 9,000 have to be tested by 1999. A That's the government's position. Clearly not. Q But some of them have to be started to be tested by 1999. A The statute doesn't specify that when the testing of particular chemicals is to occur. It only addresses the time frame for implementing the program. And after EPA got public comments, it implemented the program. It started the program. But the point here is, the question the court has to ask is, okay, if we required EPA at a date certain to complete all of the testing for all of the chemicals, and let me remind the court, this was completely new science. What was included and what has been included in implementing the program is actually setting up methodologies and protocol for laboratories. Laboratories didn't even know where to begin on this. So, but let's assume all of that, the court this quarter, the district court says, EPA, by date certain, you have got to implement the screening program, complete all of the testing. The question then comes to, in terms of standing, is can these plaintiffs say when that testing is done, and when that testing is done, what EPA will know, but doesn't necessarily have to disseminate to the public. It's part of the process. It will know what pesticides do have a harmful effect on the endocrine system, and at what doses of ingestion. But it doesn't. Nothing in that statute then requires EPA to do something in the marketplace. So even if this court says, finish the screening program, there's nothing that appellants or the plaintiffs have brought forth in terms of evidence to the court that says, well, once EPA has that information, we'll now know what to buy or what not to buy on the shelves. We'll now know that we don't have to spend money, assuming they do, on organic foods. We will now no longer have any fear. Clearly that can't be the case, especially because ---- Is it implicit that if they find that a level that they're presently allowing has this adverse effect, that they would reduce that level? What EPA will find at the end of the implementation of this program is not a tolerance level, which is associated with food. They'll know an ingestion more of a medical, physical. It's if you take, if you ingest 5 grams, and I'm pleased my units are wrong, clearly, but if you ingest 5 grams a day, that will disrupt your endocrine system. That's different than setting a tolerance level of how much residue of pesticide X can be on your tomatoes on the shelf in your grocery store. So simply because EPA knows if you took a spoonful of pesticide X, that would disrupt your endocrine system. That doesn't necessarily correlate to what happens in the marketplace on your shelf. And I just want to point out for the Court, in terms of the emotional evidence, the evidence of emotional injury here, what it seems to establish is that these plaintiffs have had a longstanding concern about pesticides. And it's one that's not specific to pesticides with endocrine disrupting effects. It's not specific to EPA implementing a screening program for those types of pesticides. Rather, it's one that one appellant has had, she's had these emotional concerns since childhood. Another one had since she was in college. The pesticides are, the concern about pesticides is one of pesticides in general. It's not limited to exposure by ingestion. And in terms of, for example, physical harm, one of the appellants comes right out and says, my own exposure, this is page 172, paragraph 8, my own exposure to potentially high risk pesticides has not been limited to the food I eat. The other affidavit states, I am concerned that I have been exposed to pesticides throughout my life. These general types of allegations, as you pointed out, I, well, generally the requirement is concrete, particularized allegations that go to the particular violation that's been alleged by the agency. And we simply don't have this in this case. Unless the Court has any further questions, the judgment of the district court should be affirmed. Thank you. Thank you, Your Honors. First of all, in the statute 346A.P.6, it says that the EPA shall, quote, take action under such statutory authority as is necessary to ensure the protection of public health. I think that says they'll do something. Returning to the standing inquiry, it's important to understand that plaintiff's injury does not arise from the fact that they are getting sick or may get sick. It's that they are not being given the information because of EPA's failure to implement. Congress clearly intended Americans to be able to do that. Did you argue that before the district court or even in your briefs? Didn't that come from amicus briefs, the whole argument about informational standing? This is not an informational standing argument, so let me separate us from that. There is an informational component to this. When the EPA does their work and they undertake what's in 346A.P.6, we as Americans will be able to appreciate and know what we can eat. That's all I'm saying. So there's an informational component in all of our standing, separate from a distinct informational injury. They're injured because they don't know what they can eat. Congress intended Americans to be able to feel comfortable when they go to the supermarket. That's an intended benefit of this statutory scheme. We do not have that because EPA has failed to implement. That is the problem here. Again, it doesn't go to whether there is a pesticide out there, which apparently on the website it says there are some already that are endocrine disruptors. It goes to the fact that we don't know, and Congress intended for EPA to perform these tests so that plaintiffs would know. And again, that's the inquiry for standing. It's a reasonable fear that because they're doing all this testing and because they're finding chemicals which are endocrine disrupting, that there may be others currently that we're eating. That reasonable fear is just like the aesthetic injury reasonable fears in other standing cases before this court, and that's why standing stands here. All right, counsel. Thank you. Please set your time. Positions committee versus EPA will be submitted. We'll take up our last case for the day. DeLue versus Adamson. Thank you.
judges: Thompson, Wardlaw, Bolton